**GARGOYLES, INC. and Pro-Tec, Inc., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**No. 342–88C.**

United States Claims Court.

Oct. 5, 1992.

Paul T. Meiklejohn and George B. Fox, Seattle, Washington, for plaintiffs.

Steven M. Amundson, Dept. of Justice, Washington, D.C., and Jay B. Winchester, Dept. of Army, Fort Detrick, Md., for defendant.

## OPINION

MARGOLIS, Judge.

Plaintiffs Gargoyles, Inc. and Pro-tec, Inc. (individually, Gargoyles and Pro-tec; collectively, plaintiffs) brought suit in this court pursuant to 28 U.S.C. § 1498(a),[1] seeking damages for the infringement of the design and utility patents. Defendant argues that there is no infringement and that the patents are invalid. After a five-day trial in Seattle, Washington and Washington, D.C. and after having examined the entire record, this court finds that defendant has not infringed plaintiffs' patents.

---

1. Section 1498(a) reads, in pertinent part, as follows:

   Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Claims Court for the recovery of his reasonable and entire compensation for such use and manufacture.

## BACKGROUND

The United States Patent Office (PO) issued to Pro-tec the two patents that are the subject of this suit: U.S. Patent No. 270,165 (design patent), issued on August 16, 1983, and U.S. Patent No. 4,741,611 (utility patent), issued on May 3, 1988. Pro-tec subsequently assigned both patents to Gargoyles. The utility and design patents disclose eyeglasses with zero power lenses that are integrally formed with a bridge and have substantial wrap depth. Other features of the eyeglasses include temples that are attached to the lenses rather than a frame, and a nosepiece surrounding the bridge that is capable of absorbing shocks to the lenses.

Through the past few years, the United States Army (Army) has purchased from American Optical Corporation (AO) several hundred thousand pairs of accused ballistic/laser protective spectacles (B/LPS or accused device). As a result of these purchases, plaintiffs filed suit in this court on June 9, 1988, alleging that the defendant, through the Army, had violated 28 U.S.C. § 1498(a) by using the B/LPS and having them made without plaintiffs' permission even though they infringe the design patent as well as claims 1, 2, and 8 of the utility patent.[2]

Defendant denies that the B/LPS eyewear infringes plaintiffs' patents and attacks the validity of plaintiffs' patents, asserting that Pro-tec's utility patent fails to set forth the best mode contemplated by the inventor of carrying out his invention contrary to 35 U.S.C. § 112; that plaintiffs' eyewear was in public use and on sale more than a year before the filing of the utility and design patents; that the design and utility patents are obvious in light of the prior art; and that the design and utility patents are unenforceable because of inequitable conduct on the part of Pro-tec and inventor Dennis Burns in the application process.

## DISCUSSION

■ The proper starting point for this court's analysis of the issues presented at trial is an examination of the allegation of infringement under 28 U.S.C. § 1498(a). This court need consider the validity arguments only if infringement is found. *See Morton Int'l, Inc. v. Cardinal Chem. Co.,* 959 F.2d 948, 952 (Fed.Cir.1992). To prevail, plaintiffs must prove infringement by a preponderance of the evidence. *See Lemelson v. United States,* 752 F.2d 1538, 1547 (Fed.Cir.1985).

## I. DESIGN PATENT

■ The test for infringement of a design patent "requires that 'if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.' " *Litton Systems, Inc. v. Whirlpool Corp.,* 728 F.2d 1423,

---

**2.** The above mentioned claims read as follows:

  1. Eyeglasses especially adapted for sports use, comprising:

    a pair of lenses and a bridge integrally formed with each other, said lenses having a relatively small height, a relatively large width and substantial wrap depth in the horizontal dimension, said lenses further having toric inner and outer surfaces which have radii of curvatures that are selected to provide zero power;

    a pair of temples pivotally secured to the outer edges of respective lenses; and a nosepiece secured to said bridge, said nosepiece having a pair of nose pads adapted to contact and conform to the nose of a wearer.

\*   \*   \*   \*   \*   \*

  2. The eyeglasses of claim 1 wherein said nosepiece includes a base portion tightly surrounding said bridge while remaining free of rigid connection thereto so that said nosepiece is capable of absorbing shocks imparted to said lenses.

\*   \*   \*   \*   \*   \*

  8. The eyeglasses of claim 1, further including a pair of mounting pads integrally formed at the outer edges of respective lenses, and a hinge having one mounting leg embedded in each mounting pad and another portion secured to a respective temple.

1444 (Fed.Cir.1984) (quoting *Gorham Co. v. White,* 81 U.S. (14 Wall.) 511, 528, 20 L.Ed. 731 (1871)). However, for design patent infringement to exist, " 'the accused device must appropriate the novelty in the patented device which distinguishes it from the prior art.' " *Litton,* 728 F.2d at 1444 (quoting *Sears, Roebuck & Co. v. Talge,* 140 F.2d 395, 396 (8th Cir.1944)). Nevertheless, if plaintiffs do not satisfy the *Gorham* standard by a preponderance of the evidence, "there is no need for detailed analysis in terms of the prior art." *Lee v. Dayton–Hudson Corp.,* 838 F.2d 1186, 1189 n. 4 (Fed.Cir.1988).

This court concludes that the resemblance between the accused device and the eyewear shown in the design patent is insufficient to deceive an ordinary observer or purchaser, as *Litton Systems* requires. Wayne Burkhardt (Burkhardt), a civilian mechanical engineer with the Army, testified that the temples of the accused device have sideshields attached to them to protect the periphery of the face from projectiles. These sideshields give the accused device a noticeably different appearance from the eyewear shown in the design patent. Also, figure 4 of the design patent, a view from the side of the eyewear, shows the lenses have much more wrap depth than the accused device has without sideshields. Figure 6, a view from the bottom of the eyewear, reveals that the lenses lean away from the front more than the accused device's lenses do.

Further, the nosepiece of the accused device appears quite different from the nosepiece displayed in the design patent. The design patent nosepiece surrounds the bridge between the lenses; on the other hand, the nosepiece on the accused device appears to be clipped onto the bridge, leaving exposed a portion of the bridge on the front of the eyewear between the lenses. Another obvious difference between the eyewear is the configuration of the nose pads. The accused device has nose pads that are attached to metal arms that extend rearward from the nose piece. This configuration looks very conventional or, some might say, old-fashioned. The nose piece shown in the design patent has nose pads that are integral with the base portion of the nose piece—no metal arms are employed. As a result the nosepiece of the design patent eyewear looks more stylish than that of the accused device and, in any event, certainly looks different from the accused device's nosepiece.

Finally, a difference between the eyewear at issue is the placement of the temples to the lenses. The temples of the accused device are attached to the lenses at the top of the lenses. By contrast the temples of the eyewear shown in the design patent are positioned lower on the lenses, about a quarter of the way down from the top. This court concludes that plaintiffs have not demonstrated by a preponderance of the evidence that the defendant has infringed the design patent.

## II. UTILITY PATENT

■ To determine whether the utility patent has been infringed, this court must make two inquiries: whether literal infringement has occurred and, if not, whether infringement has occurred under the doctrine of equivalents. "A finding of literal infringement requires that the asserted claims, as properly construed, read on the accused product." *Morton Int'l, Inc.,* 959 F.2d at 950. Under the doctrine of equivalents, an accused device may be found to infringe, despite the lack of literal infringement, if the device performs "substantially the same function in substantially the same way to give substantially the same result" as the patented device. *Hormone Research Found., Inc. v. Genentech, Inc.,* 904 F.2d 1558, 1564 (Fed.Cir.1990), *cert. dismissed,* —— U.S. ——, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991). Thus, this doctrine "involves determining whether the accused product is 'equivalent' to what is described by the claim language." *Wilson Sporting Goods Co. v. David Geoffrey & Assoc.,* 904 F.2d 677, 684 (Fed.Cir.1990). To aid in equivalency analysis, the Federal Circuit has ruled that courts should visualize a hypothetical claim literally encompassing the accused device and determine whether such a claim would have been al-

lowed over the prior art. If not, then the patentee cannot prevail under the doctrine of equivalents. *Id.*

Plaintiffs contend that defendant has infringed claims 1, 2 and 8 of the utility patent. *See* footnote 2, *supra.* Defendant maintains that plaintiffs have not met their burden on any of the claims.

### A. Claim 1

Regarding claim 1, defendant denies that the accused device literally infringes that portion of the claim concerning zero power and substantial wrap depth. Beginning with zero power, this court must determine the meaning of this term of art to ascertain whether defendant has literally infringed this portion of the patent.

Although defendant has presented evidence that plaintiffs' technical experts David Grey and F. Dow Smith had submitted declarations to the PO during the prosecution of the utility patent indicating their understanding that the term "zero power" means a refractive power of 0.0 diopters, this court finds that it is unlikely plaintiffs meant for their eyewear to have a refractive power of exactly 0.0 diopters. Edward Bulchis, the attorney responsible for the prosecution of this utility patent, convincingly testified that plaintiffs considered zero power to mean a noncorrective lens.

■ Both plaintiffs and defendant agree that the measure for determining the proper meaning of zero power as used in the utility patent may be found in the standards published by the American National Standards Institute (ANSI) in 1979. However, the parties disagree whether the ANSI standards for sunglasses and fashion eyewear, known as ANSI Z80.3, should apply to the utility patent or whether those for occupational and educational eye and face protection, known as ANSI Z87.1–1979, apply. This court agrees with defendant that the latter ANSI standards, which apply to industrial safety, are more appropriate for the following reasons. The utility patent makes clear that the patented device is to be used for sports and protective use. The title and abstract of the utility patent use such language, as do the "Background Art" and "Best Mode" sections. In fact, in column 3, line 10, in the "Best Mode" section, the patent reads that the lenses may be used around machinery.

The actions of plaintiffs indicate they expected that the patented eyewear would be used in an industrial setting. Evidence of this expectation includes an advertisement for the "Arctic Clear" tint of the patented device that states it is "ideal for ... industrial application...." Also, the Gargoyles Business Plan for 1985–88 indicates that Gargoyles hoped to enter the industrial safety market and that, at the time of the report, two major industrial firms were considering supplying certain employees with the patented device. It is clear from the foregoing evidence that the patented device is more than run-of-the-mill fashion eyewear. Even if plaintiffs derive most of their revenue for the patented device from the fashion eyewear market, the evidence indicates that the patented device was designed for use in industrial safety markets as well. Therefore, this court concludes that the ANSI Z87.1–1979 standard provides the proper measure for the term "zero power" as it is used in the utility patent.

■ ANSI Z87.1–1979 states that "[t]he refractive power, in any meridian, of any noncorrective lens shall not exceed $+/- \frac{1}{16}$ diopter," which equals $+/- .0625$ diopters. As Burkhardt testified, and plaintiffs do not dispute, the refractive power of the accused device is $-.08$ diopters, more than zero power as that term is defined employing ANSI Z87.1–1979. Therefore, the accused device does not literally infringe claim 1 of the utility patent as to zero power.

Claim 1 also states that the patented device has lenses with "substantial wrap depth in the horizontal dimension." There is a divergence of opinion over whether the accused device has substantial wrap depth. Melvin Jee, a mechanical engineer for the Army, stated in a deposition that it was his opinion that the accused device had more wrap depth than the patented device. Burkhardt also stated he thought "without

measuring it" that the two devices are "not too far different...." Transcript at 814. On the other hand, Ronald Tillen, an employee of the manufacturer of the accused device, stated at a deposition that the wrap depth of the accused device was not substantial because it "is insufficient to give full peripheral protection." Tillen deposition at 66.

Considering that the burden is on plaintiffs, this court finds plaintiffs' failure to present an expert who could measure the wrap depths of the two devices and compare them to be important. Also, this court questions how substantial the wrap depth of the accused device could be when the manufacturer found it necessary to provide the device with sideshields to protect against projectiles from the periphery. Finally, after taking plaintiffs' challenge to compare the accused device to the patented device, this court found that the accused device actually appeared to have less wrap depth than the patented device. Consequently, this court finds that plaintiffs have not demonstrated by a preponderance of the evidence literal infringement of claim 1 as to substantial wrap depth.

■ Turning to the doctrine of equivalents, this court concludes that no infringement of claim 1 has occurred because the accused device does not perform substantially the same function in *substantially the same way* to give substantially the same result as the patented device. *See Hormone Research Found.*, 904 F.2d at 1564. As the Disclosure of the Invention in the utility patent notes, "an object of the invention" is "to provide eyeglasses having sufficient wrap depth to adequately shield the eye...." Utility patent, column 1, lines 58–59. To achieve such a function, the manufacturer of the accused device employed sideshields to protect against projectiles, thus indicating that without sideshields the wrap depth of the accused device likely did not adequately shield the eye.

This court also concludes that a hypothetical claim covering the accused device would not be patentable over the prior art. As defendant has pointed out, eyewear with sideshields similar to those used in the accused device can be found in an illustration in the ANSI Z87.1–1979 from 1979. Because the hypothetical claim would not be patentable over the prior art, plaintiffs cannot prevail as to claim 1 under the doctrine of equivalents. *See Wilson Sporting Goods*, 904 F.2d at 684.

**B.  Claim 2**

■ Claim 2, which pertains to the nose piece, also has not been infringed, either literally or under the doctrine of equivalents. The utility patent describes a nose piece that surrounds the bridge of the eyewear. As noted in section I, *supra*, the nosepiece of the accused device does not "surround" the bridge, but rather appears to be clipped onto the bridge, leaving the front of the bridge exposed to view. In fact, according to the military specifications for the accused device, the nose piece was manufactured to be removed when necessary and indeed freely snaps off the bridge. Literal infringement has not occurred.

■ Again, as noted in section I, *supra*, the accused device has nose pads that are attached to metal rods, which are riveted into the nose piece. This configuration looks conventional because it was patented in this country in 1956. *See* U.S. Patent No. 2,730,924. Following *Wilson Sporting Goods*, plaintiffs cannot prevail under the doctrine of equivalents because a hypothetical claim encompassing the accused device could not be patented over the prior art. Plaintiffs have not met their burden as to claim 2.

**C.  Claim 8**

■ Claim 8 provides that the patented device has "a pair of mounting pads integrally formed at the outer edges" of the lenses "and a hinge having one mounting leg embedded in each mounting pad...." *See* footnote 2, *supra*. The Best Mode section of the utility patent helps clarify the meaning of the claim, explaining that the patented device employs conventional hinges and temples. An examination of the accused device reveals that no mounting legs are embedded in mounting pads.

Rather, the accused device employs a mounting leg that is integrally formed with the lenses. Unlike the temples shown in the utility patent, which have hinges secured to them with what appear to be screws, the temples of the accused device have hinges integrally formed with them. Consequently, no literal infringement has occurred.

■ Defendant has not infringed claim 8 under the doctrine of equivalents either. The accused device does not perform in substantially the same way as the patented device because it does not employ conventional hinges and temples and nothing is embedded. Also, defendant has shown that a hypothetical claim encompassing the accused device probably could not be patented over the prior art. At least as early as 1971, the National Aeronautics and Space Administration had produced eyewear that employed temple-to-lens attachments very similar to those used by the accused device.

### CONCLUSION

Finding that plaintiffs have not proven infringement by a preponderance of the evidence, this court need not reach the question of validity. *See Morton Int'l, Inc.*, 959 F.2d at 952. The clerk will enter judgment for the defendant. No costs.